# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KHS CORP., | : | |
|     Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | NO. 16-55 |
| | : | |
| SINGER FINANCIAL CORP., et al., | : | |
|     Defendants. | : | |

August 23, 2018                                                                                                    Anita B. Brody, J.

## **MEMORANDUM**

Plaintiff KHS Corp. moves to certify a class action under Federal Rule of Civil Procedure 23. KHS brings claims against Defendants Singer Financial Corp. ("SFC") and Paul Singer ("Singer")[1] under the Telephone Consumer Protection Act ("TCPA"). Based on the following reasoning, I will deny KHS' motion for class certification.

## I. BACKGROUND

### A. Defendant SFC's Faxing Practices

Defendant SFC is a company that provides commercial real estate financing and is based in Philadelphia, Pennsylvania. For 25 years, Defendant Paul Singer has been the President and sole owner of SFC. It is a small company, employing only two to four people at a given time. Singer Dep. 54:19-55:2, ECF No. 82-3. Throughout SFC's existence, the company has faxed advertisements to potential customers.[2] The faxes are believed by Singer to be important for

---

[1] KHS has also sued John Doe Defendants 1-12.

[2] In Defendants' Answer, they refer to the faxes in question as advertisements. Answer ¶¶ 15-17, ECF No. 9. But, in his deposition, Singer denies that the faxes sent to KHS were ads and refers to the faxes as "information." *See* Singer Dep. 63:19-23.

1

generating business for SFC. *Id.* at 59:14-16. SFC uses faxing software to send its ads, and since at least 2014, it has been using the software, ActiveFax. *See id.* at 51:16-52:14.

SFC sent faxes to people and companies using a contact database with more than 3,000 entries. *Id.* at 36:3-14. Singer had created the database when he began SFC in 1992 and maintained it ever since. *Id.* at 35:7-12. It included real estate investors, realtors, bankers, attorneys and accountants. Singer states that he added the contacts over the years by either cold-calling, networking at Chamber of Commerce meetings, or meeting over lunch. *Id.* at 26:2-9. He avers that he has spoken personally to each contact, and he alleges that if he obtained a contact's fax number, it would have been during one of those conversations. *Id.*

Not only does Singer claim to have received every fax number in his database directly from each contact through phone or in-person conversations, but he also claims that he received permission from each contact to send a "faxed flyer on [SFC]." *Id.* at 46:10-22. Additionally, he states that he would follow up with each contact at least once a year and ask if it was "okay if [he] continue[s] to send [them] information" via fax. *Id.* at 48:5-18. One of SFC's employees, John Licari, states that he had observed Singer "call[] people on a regular, consistent basis every day," and that Singer would talk to "anywhere from 15 to 25 people during a day." Licari Dep. 46:1-11, ECF No. 82-8. In each of those conversations, Licari claims that Singer "always asks . . . if it is okay for him to send informational faxes." *Id.*

Using the database that Singer had built and maintained since 1992, SFC would send thousands of faxes a year. Singer Dep. 48:19-49:2. Singer made the decision about when and to whom to send faxes. *Id.* at 24:18-25:7. For example, during tax season Singer might decide to send faxes to accountants, and then he or an employee would compile the fax numbers of accountants from Singer's database of contacts. *See id.* at 24:14-28:7. Once the list was

2

compiled, an SFC employee would use the program ActiveFax to send the faxes. *Id*. at 28:8-17. Each specific fax sent to a specific group of people is considered one fax "broadcast," and ActiveFax creates a record of each broadcast that includes sufficient information to conclude that a fax was received. *See* Howard Rep. 6-14, ECF No. 82-4. A fax broadcast can involve thousands of recipients and occur over multiple days. *See id*.

### B. Faxes Received by Putative Class Members and Plaintiff KHS

KHS moves to certify the following class based on claims under the Telephone Consumer Protection Act ("TCPA")[3]:

> Each person sent one or more telephone facsimile messages during the period June 24, 2014 to June 22, 2016, from Singer Financial Corp. promoting the availability of commercial loans or real estate.

Pl.'s Am. Mot. Class Cert. 1, ECF No. 82.

Over the class period, the ActiveFax records indicate that SFC sent 30,706 faxes to 2,297 unique recipients. Howard Rep. 13. Some recipients received over 70 faxes. *Id*. As stated above, Singer claims to have obtained consent from every putative class member because every putative class member is on his contact list, and Singer says that he received consent to send faxes from everyone on that list. For example, during Singer's deposition he was asked about a putative class member, Apothaker Law Office, by opposing counsel. Singer Dep. 76:1-77:1. Singer stated that he remembered the contact from the firm as David Apothaker, and that Apothaker had done legal work for him. *Id*. He added that he "absolutely" had consent from Apothaker to send him

---

[3] In 1991, Congress passed the Telephone Consumer Protection Act ("TCPA"), later amended by the Junk Fax Prevention Act of 2005. 47 U.S.C. § 227. The TCPA generally prohibits the sending of any "unsolicited advertisement" via fax. *Id*. § 227(b)(1)(C). A faxed advertisement is unsolicited if the recipient has not given "prior express invitation or permission" to receive it. *Id*. § 227(a)(5). To enforce the TCPA, Congress provided for a private right of action that allows individuals to sue for relief based on a violation "of the [statute] or the regulations prescribed under [the statute]." *Id*. § 227(b)(3). Any fax sender that violates the TCPA or its regulations faces a fine of $500 for each fax sent, or up to $1,500 for each fax if the violation was willful. *Id*.

faxes. *Id*. Singer did not explicitly discuss any other person on that fax list but said that Apothaker was "indicative of the whole list." *Id*. at 80:18-24.

During the class period, Plaintiff KHS alleges that it received eight faxed advertisements from SFC. The owner of KHS, Karl H. Schwemlein, denies that KHS was ever in contact with Singer or SFC, and he denies ever providing KHS' fax number to SFC along with consent to receive faxed ads. *See* Karl H. Schwemlein Dep. 12:5-17, ECF No. 82-5. On the other hand, Singer asserts that, in the 1990s he spoke directly with Schwemlein over the phone during a cold call. Singer Dep. 32:12-33:12. Like every other contact on his list Singer asserts that, in his conversation with Schwemlein. Singer was given permission to send a faxed flyer about SFC. Singer Dep. 42:22-44:14.

## II. LEGAL STANDARD

To warrant certification, a "class action must satisfy the four requirements of Rule 23(a) and the requirements of either Rule 23(b)(1), (2), or (3)." *Marcus v. BMW of N. Am., LLC,* 687 F.3d 583, 590 (3d Cir. 2012). To meet the requirements of Rule 23(a): "(1) the class must be 'so numerous that joinder of all members is impracticable' (numerosity); (2) there must be 'questions of law or fact common to the class' (commonality); (3) 'the claims or defenses of the representative parties' must be 'typical of the claims or defenses of the class' (typicality); and (4) the named plaintiffs must 'fairly and adequately protect the interests of the class' (adequacy of representation, or simply adequacy)." *In re Cmty. Bank of N. Va.,* 622 F.3d 275, 291 (3d Cir. 2010) (quoting Fed. R. Civ. P. 23(a)(1)-(4)). In this case, KHS seeks certification under Rule 23(b)(3), which imposes the additional requirements that "(i) common questions of law or fact predominate (predominance), and (ii) the class action is the superior method for adjudication (superiority)." *Id.* Plaintiffs seeking certification pursuant to Rule 23(b)(3) must also first

4

demonstrate that the proposed class is "currently and readily ascertainable." *City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.*, 867 F.3d 434, 439 (3d Cir. 2017) (citation omitted).

Plaintiffs must affirmatively demonstrate compliance with Rule 23. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011). Rule 23 is not a pleading standard; each requirement must be "satisf[ied] through evidentiary proof." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). "Factual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence. . . . [T]o certify a class the court must thus find that the evidence more likely than not establishes each fact necessary to meet the requirements of Rule 23." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 320 (3d Cir. 2008). Before certifying a class, a court must perform a "rigorous analysis" to ensure that all the Rule 23 prerequisites have been satisfied. *Behrend*, 569 U.S. at 33 (quoting *Dukes*, 564 U.S. at 350-51).

## III. DISCUSSION

KHS has not established that—based on a preponderance of the evidence—its putative class meets the requirements of Rule 23. Specifically, KHS' motion for certification fails the predominance prong of Rule 23(b)(3). Therefore, I will focus the discussion on predominance and not address the other requirements under Rule 23.

To satisfy the predominance requirement of Rule 23(b)(3), a plaintiff must show that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3); *see also Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 370 (3d Cir. 2015) ("[The] predominance test asks whether common issues of law or fact in the case predominate over non-common individualized issues of law or fact."). If proof of an essential element of the cause of action requires "individual treatment," then class certification is "unsuitable." *Hydrogen Peroxide*, 552 F.3d at 311 (quoting *Newton v. Merrill*

5

*Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir. 2001), *as amended* (Oct. 16, 2001)).

The standard for predominance is "demanding." *Id.* (quoting *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997)). It requires "some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *Id.* (quoting *In re New Motor Vehicles Can. Exp. Antitrust Litig.*, 522 F.3d 6, 20 (1st Cir. 2008). Without a showing by a plaintiff of how common proof can establish those specific issues—such as liability, affirmative defenses, or damages—they "will inevitably overwhelm questions common to the class." *See Behrend*, 569 U.S. at 34.

In this case, a prediction of how issues will "play out" makes clear that the individualized question of consent will defeat predominance of common issues because the ultimate question for each class member will be whether a given fax sent by SFC was solicited or unsolicited. A violation of the TCPA only occurs if the fax in question was an "*unsolicited* advertisement." *See* 47 U.S.C. § 227(b)(1)(C) (emphasis added). A solicited advertisement is not a violation and does not require an opt-out notice. *Bais Yaakov of Spring Valley v. Fed. Commc'ns Comm'n*, 852 F.3d 1078, 1083 (D.C. Cir. 2017) (invalidating the Federal Communication Commission's "Solicited Fax Rule" that had required opt-out notices on *both* solicited and unsolicited ads), *cert. denied sub nom. Bais Yaakov of Spring Valley v. F.C.C.*, 138 S. Ct. 1043 (2018).[4]

---

[4] The D.C. Circuit's opinion in *Bais Yaakov* is likely binding even outside of the D.C. Circuit because that circuit had become the sole forum for addressing the FCC's rule. *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 467 (6th Cir. 2017), *as corrected on denial of reh'g en banc* (Sept. 1, 2017), *cert. denied,* 138 S. Ct. 1284, 200 L. Ed. 2d 470 (2018) (citing *Peck v. Cingular Wireless, LLC*, 535 F.3d 1053, 1057 (9th Cir. 2008)). Whether or not *Bais Yaakov* is binding, the Court adopts its reasoning. *Accord Gorss Motels, Inc. v. Safemark Sys., LP*, No. 616CV01638ORL31DCI, 2018 WL 1635645, at *6 (M.D. Fla. Apr. 5, 2018), *appeal docketed*, 18-12511 (11th Cir. June 15, 2018).

A fax is a solicited advertisement if it was sent with the recipient's "prior express invitation or permission, in writing or otherwise." 47 U.S.C. § 227(a)(5). When a recipient voluntarily provides a contact number, she provides express consent to receive material "relate[d] to the reason why [she] provided [her] . . . number in the first place." *Fober v. Mgmt. & Tech. Consultants, LLC*, 886 F.3d 789, 793 (9th Cir. 2018); *see Daubert v. NRA Grp., LLC*, 861 F.3d 382, 390 (3d Cir. 2017) (explaining and incorporating the FCC's interpretation of "prior express consent" to include when a consumer provides his number to a creditor in a credit application and is then contacted by phone regarding that debt); *Blow v. Bijora, Inc.*, 855 F.3d 793, 804 (7th Cir. 2017) (finding express consent under the TCPA to receive various promotional texts from a retailer when a consumer had provided a cell phone number on a form to receive discounts from that retailer). Thus, if a fax number is voluntarily provided to a sender by a recipient, a court will have to analyze whether any fax sent to that recipient relates to the reason the contact info was provided in the first place, because if it does, then express consent was provided for the fax, and it cannot be an "unsolicited advertisement."

Individualized issues of consent often preclude class certification of TCPA fax cases. *See, e.g.*, *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 470 (6th Cir. 2017); *Gene And Gene LLC v. BioPay LLC*, 541 F.3d 318, 329 (5th Cir. 2008); *Gorss Motels, Inc. v. Safemark Sys., LP*, No. 616CV01638ORL31DCI, 2018 WL 1635645, at *6 (M.D. Fla. Apr. 5, 2018) ("[T]he issues of consent cannot be resolved without individualized inquiry, . . . and . . . class certification is [thus] inappropriate."), *appeal docketed*, 18-12511 (11th Cir. June 15, 2018); *Alpha Tech Pet Inc. v. LaGasse, LLC*, No. 16 C 4321, 2017 WL 5069946, at *8 (N.D. Ill. Nov. 3, 2017) ("[T]he Court finds that individualized consent issues would require a series of mini-trials, thus defeating predominance and superiority."); *Brodsky v. HumanaDental Ins. Co.*,

269 F. Supp. 3d 841, 849 (N.D. Ill. 2017) ("[C]onsent issues defeat superiority and predominance . . . ."); *Forman v. Data Transfer, Inc.*, 164 F.R.D. 400, 404 (E.D. Pa. 1995) (determining that the "essential question of fact" was whether a fax was sent without express permission—a question that was "inherently individualized").

In *Sandusky*, the Sixth Circuit affirmed a district court's denial of a TCPA class based on individualized consent issues. 863 F.3d at 470. In that case, the defendant had allegedly sent illegal faxes to more than 40,000 putative class members. *Id*. at 468. Importantly, there was evidence that "several thousand" class members were actually former or current customers of the defendant. *Id*. Many of those customers had filled out forms providing both their names and fax numbers to defendant, arguably providing consent to receive faxed ads. *Id*. Identifying which of the class members were customers who had given consent would have required the district court to cross-check thousands of consent forms against the thousands of class. *Id*. at 469. Therefore, such an intensive individualized inquiry defeated class certification.

In *Gene*, the Fifth Circuit reversed the district court's finding that certification was proper for a TCPA fax claim. 541 F.3d at 323. The defendant had "culled fax numbers from purchased databases but also periodically culled fax numbers from various other sources" such as "from information submitted by merchants . . . , from information submitted at trade shows . . . , and also from lists of companies with which [defendant] or its affiliates had an established business relationship." *Id*. at 328. The court noted that the defendant's database that it used to send the faxes failed to provide an accurate recording of whether a recipient gave consent. *Id*. The circuit court determined that the plaintiff had not met its burden of demonstrating how "generalized proof concerning the lack of consent" could apply across the class in light of the disparate ways in which the defendant obtained the class members' fax information and lack of records. *Id*. at

329. Without generalized proof, the court concluded that "myriad mini-trials" on consent were unavoidable.

Here, the facts demonstrate many reasons why common questions will not predominate leading to the potential for thousands of mini-trials on the individualized issue of consent. For each class member, a fact finder will have to determine whether a received fax was solicited or unsolicited. This is raised because of the unchallenged nature of the evidence of how Singer created his contact list that was used to fax putative class members. Over the 25 years he was in business Singer claims to have added to his list continually by speaking directly to potential contacts, either through networking or on cold calls. Importantly, Singer claims that when he spoke to people and received a fax number, he always would ask for permission to send faxed flyers. Thus, issues of consent are clearly raised even more strongly than those in *Gene* where the various ways in which contacts were added coupled with the possibility of consent precluded class certification. *See* 541 F.3d at 329; *Brodsky*, 269 F. Supp. 3d at 849 (finding that "idiosyncratic consent issues defeat . . . predominance"). Additionally, like the potential for thousands of individualized inquires in *Sandusky*, the fact that Singer claims he received consent from each contact would require, at minimum, some inquiry by a factfinder into every class member. *See Sandusky*, 863 F.3d at 468-69; *Alpha Tech Pet Inc., LLC*, 2017 WL 5069946, at *5. KHS failed to elicit any common evidence that those who received a fax had not given their consent.

KHS' own individual claim is illustrative of the problem. On the one hand, Singer claims that he remembers a specific conversation with Karl H. Schwemlein of KHS. Singer states that he asked for Schwemlein's fax number and also asked whether he could "send [him] some information on [Singer's] company." Singer Dep. 42:22-43:23. On the other hand, Schwemlein

9

denies ever speaking to Singer or having any knowledge of him or his company. Karl H. Schwemlein Dep. 12:5-17. KHS has not provided any further evidence to contest Singer's assertion of consent. Without more, whether Singer and Schwemlein spoke and which party is more credible is simply a fact question that must be determined by a jury. When this situation is aggregated with the potentially thousands of other class members, it creates the very real potential for thousands of mini-trials.

Further evidence of the potential for mini-trials is shown by Singer's ability to demonstrate in-depth knowledge of a one of his contacts when questioned by opposing counsel. During his deposition, Singer was asked about the Apothaker Law Office by opposing counsel. Singer stated that he remembered the contact from the firm as David Apothaker, and that Apothaker had done legal work for him. Singer Dep. 76:5-77:1. Singer also claimed that he "absolutely" had consent to send Apothaker faxes. *Id*. It would require immense court resources to sort out the possible unique paths of each class member to Singer's contact list.

KHS claims that even if Singer received consent to send faxes, that consent was for "information" and not advertising. The problem for KHS, however, is that if a recipient voluntarily gives her fax number, she consents to receive material related to the reason she gave the number. *See Fober*, 886 F.3d at 793. Singer has alleged that he received fax numbers and consent from each class member both to receive "flyer[s]," Singer Dep. 46:7-21, and "information" on SFC, *id*. at 47:17-48:18. To determine whether the faxes relate to the reason that a class member gave her fax number, the Court, or a jury, would have to engage in an intensely fact specific inquiry—requiring precise analysis of the conversation as well as credibility determinations. Again, purported conversations with other class members may raise

similar factual issues that will need to be resolved individually. Ultimately, there can be no predominance in the face of such individualized disparity.

It is important to note that despite the potential consent issues many TCPA fax cases are still appropriate for class certification. For example, in cases where the fax recipients have had no prior interactions with the sender—such as when the sender obtained the numbers by purchasing a list—the question of consent may be a common one and allow for certification. *See, e.g.*, *Bridging Communities Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1125 (6th Cir. 2016), *cert. denied,* 138 S. Ct. 80 (2017) (finding district court abused its discretion in denying class certification based on consent issues when defendant had purchased fax lists from a provider and had presented no evidence that class members may have consented); *Practice Mgmt. Support Servs., Inc. v. Cirque du Soleil, Inc.*, 301 F. Supp. 3d 840, 844, 846 (N.D. Ill. 2018) (determining that the case did not "implicate individualized consent" when sender had sent faxes through a third-party that purchased the fax numbers from "list providers"), *class decertified as untimely*, No. 14 C 2032, 2018 WL 3659349 (N.D. Ill. Aug. 2, 2018). That is not the case here where Singer compiled his fax list over 25 years in various, unique ways and testified that he received consent from each recipient.

## IV. CONCLUSION

For the reasons set forth above, I will deny KHS' motion for class certification.

s/Anita B. Brody
_____
ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to: